**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DAVID WEINER, *Plaintiff*, | ) | No. 23 C 16573 |
| v. | ) | Chief Judge Virginia M. Kendall |
| MARCIN CHOJNACKI, *et al.*, *Defendants*. | ) | |

**MEMORANDUM OPINION & ORDER**

Plaintiff David Weiner brought a complaint alleging violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c), (d), and various state-law claims. (Dkt. 1). It is one of 15[1] related cases, all in front of this Court, that Plaintiff's attorneys have brought alleging that various overlapping Defendants engaged in a fraudulent real-estate investment scheme. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).

Over the course of the litigation, numerous defendants settled with Plaintiff. Nonetheless, four separate sets of Defendants filed motions for summary judgment against Weiner: Defendant CK Developers, PLLC ("CK Defendants") (Dkt. 138); Defendants BMO Property Management, Inc. and David Brandonisio ("Brandonisio Defendants") (Dkt. 149); Defendants Kendall Murphy, 1st Midwest Financial, Inc. ("Murphy Defendants") (Dkt. 152); and Defendant Marcin Chojnacki along with related entities (Chojnacki Defendants[2]) (Dkt. 142). Unlike in many of the other related cases, Weiner's Complaint does not name Kathleen Long and certain related entities as a

[1] There were as many as 16 related cases, but one, *Ascot Specialty Insurance Company, A Rhode Island Corporation v. Midwest Title & Closing Services LLC et al*, 1:24-cv-05216, settled and closed on December 4, 2025.
[2] In this case, the Chojnacki Defendants include Marcin Chojnacki, Robert Rixer, and the following entities: EJ Investment Group, Inc. and Mainstreet Property Management LLC. (Dkt. 142).

Defendant (Dkt. 1); thus, references to Long are included only as far as they are relevant to the Motions.

It has been well established throughout the related cases that counsel for the Plaintiffs have developed a boilerplate Response brief and 56.1 Statement that they utilized throughout the 15 cases. In Weiner's case, however, that litigation strategy has hit a particular bump in the road. Weiner was involved in the purchase of eight properties at issue in this case. (Dkt. 158 ¶¶ 14, 18, 23). Only four of those properties, though, were Weiner's alone. Rapport Builders LLC purchased four of the at-issue properties—Forest Avenue, McCarron Road, West End Avenue, and Highland Avenue. (Dkt. 158 ¶ 18). Weiner founded Rapport alongside Brian McNair; the operating agreement states that the two individuals had the authority to bind the company "acting together or individually with the verbal consent of the other Member." (Dkt. 158 ¶¶ 15, 17). Before filing his lawsuit, Weiner reached out to McNair, to "tell him what was going on," but McNair was not interested in talking to him. (Dkt. 158 ¶ 59). They had one conversation over the telephone, but it was brief and did not involve any substance, and have not spoken since. (Dkt. 158 ¶ 59). This lawsuit is Weiner's alone.

The Chojnacki Defendants, armed with that undisputed information, argue that as a threshold matter, Weiner does not have standing to pursue claims on the four properties that Rapport purchased. (Dkt. 143 at 3-4). Nothing in the record indicates McNair consented to suit, and the Defendants contend that under Illinois law, an LLC can bring a lawsuit only if a majority of its members or managers agree that it should do so. (*Id.*) Rather than contend with any of the Illinois case law or statutory language put forth by Defendants, though, Plaintiff does not address in any way, shape, or form, this argument, instead continuing to put forth the boilerplate Response brief that counsels have utilized throughout the related cases. (Dkt. 164). Weiner makes no mention

of the threshold standing issue.[3] Accordingly, the Court deems Weiner's claims with regard to the four properties that Rapport purchased abandoned, and the Court proceeds on the factual record and analysis only as related to the other four properties. *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir.1999) (stating that arguments not presented to the district court in response to summary judgement motions are waived); *United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010) (at the summary judgment stage, it is "not the district court's job to sift through the record and make (a party's) case for him"); *Barnes v. Nw. Repossession, LLC*, 210 F. Supp. 3d 954, 970 (N.D. Ill. 2016) (plaintiff's failure to respond to defendant's argument that it was entitled to summary judgment on claim meant that plaintiff conceded that summary judgment on that claim was warranted).

Further, the only property that Plaintiff actually discusses in the context of his purchasing scheme allegations regarding the CK Defendants is the Forest Avenue Property that is no longer at issue in this litigation, and does so with citation to nothing but Plaintiff's own testimony for the claim that CK held title to that property at any kind of "discounted price." (Dkt. 168 ¶ 80). As far as the back-end contractor side of things, CK Construction only worked on one project with Weiner: his purchase on Thornwood Court. (Dkt. 162 ¶¶ 1–2). Yet the only "back end" or post-closing damages Weiner is claiming is $100,000 for the Rose Street property, which Plaintiff admits that CK had nothing to do with. (Dkt. 158 ¶ 48). Indeed, Weiner makes no attempt to explicate an argument as to why the CK Defendants are involved in this specific case, instead resting only on general allegations about the related cases as a whole. As discussed previously in this opinion (and as will be discussed again), arguments undeveloped at summary judgment are waived. *See, e.g.*, *Palmer v. Marion County*, 327 F.3d 588, 597-98 (7th Cir. 2003) (stating that

[3] Beyond, of course, the RICO statutory standing issue that is a cornerstone of all of the related cases and thus present in the boilerplate response brief.

"because Palmer failed to delineate his negligence claim in his district court brief in opposition to summary judgment...his negligence claim is deemed abandoned"); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument...results in waiver"); *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) (holding that a party "waives an argument by failing...to develop arguments related to a discrete issue"). Thus, the CK Defendants' Motion is granted in full.

For the below reasons, the Chojnacki Defendants' Motion for Summary Judgment (Dkt. 142) is granted in part and denied in part. As to the RICO claims: the Motions are granted with regard to Plaintiff's attempt to proceed under 18 U.S.C. § 1964 on a theory of speculative profit loss; they are otherwise denied as to the RICO claims, which remain in the case in accordance with the analysis herein and will proceed to trial unless the parties can reach a settlement. The Court grants in full the other three sets of Defendants' Motions. (Dkts. 138, 149, 152). The Court also grants summary judgment on all state-law claims as to all Defendants.

## BACKGROUND

Related cases in this litigation have already made clear the shortcomings of the present record. To summarize some of the most pertinent issues discussed therein: Plaintiffs' attorneys regularly inserted entire paragraphs worth of fact into their 56.1 Response entries, routinely provided massive string cites that did not justify the stated assertions, and consistently inserted their legal allegations and conclusory assessments—including entire swaths of their expert reports—as statements of "fact," all of which the Court ignored. On multiple occasions. the Plaintiffs' attorneys cited to the allegations in the Complaint, rather than admissible evidence, in their 56.1 statements; multiple parties inappropriately admitted facts and then proceeded to provide further information in the response. The Defendants, meanwhile, routinely base their 56.1

statements on the plaintiffs' depositions in these cases and then proceed to object to plaintiffs' own citations to those exact same depositions—often the exact same *portion* of the depositions—as inadmissible hearsay (though this characterization is frequently incorrect under the party-opponent admission exception under Federal Rule of Evidence 801(d)(2)(D)).

As made clear throughout the related cases, this Court has the discretion to deem admitted facts that either side does not expressly admit yet fails to dispute with citations to admissible evidence in the record. *See Dade v. Sherwin–Williams Co.*, 128 F.3d 1135, 1139 (7th Cir. 1997) (referring to L.R. 56.1's predecessor rule, the court affirmed the district court's taking as true uncontroverted facts alleged in the movant's statement and supported by references to the record); *see also Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) ("It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies."). The Court thus proceeds by crediting only those statements that are adequately supported in the record and relevant to the resolution of the Motions. As explicated in the related cases, Defendants' frequent objections to cited emails on authenticity and hearsay grounds are overruled unless indicated otherwise in the text of the Court's analysis. The few other objections relevant to material facts are addressed below, alongside the <u>relevant</u> facts (that are undisputed unless otherwise indicated).

## I. Background

The Court also, at this point, adopts the general background information established as undisputed in the related cases without repopulating the same record with new citations. That includes the following: (Former defendant) Chase Real Estate, LLC, owned and managed by Christian Chase, provided certain services to brokers for a fee, including allowing the brokers to

use the www.mychaseagent.com domain and the mychaseagent.com email. Defendant Marcin Chojnacki ("Chojnacki") is a licensed real estate broker and was the designated managing broker for the Chase RE Roselle branch during the relevant time period. Robert Rixer ("Rixer") was a real estate broker for Chase RE Roselle during the relevant time period. Former Defendant Laurena "Lori" Mikosz also was a real estate broker for Chase RE Roselle during the relevant time period.

Chojnacki and Rixer jointly own Market Equities, Inc., a Delaware Corporation formed in 2022; Market Equities, Inc. is the sole owner of Illinois Assets as well as EJ Investments (since 2022) which in turn owns Mainstreet Property Management. Defendant EJ Investments (EJ) was formed by Chojnacki and Rixer in 2020 and was initially owned by Chojnacki and his then-fiancé Long (who also share children); in 2022, Chojnacki and Rixer's Market Equities, Inc., assumed ownership of EJ. Chojnacki's mother, Iwona, is EJ's bookkeeper. Rixer, Chojnacki and Long are signers on the EJ Investment bank account. Rixer and Chojnacki also co-own Citypoint Illinois LLC and have both been brokers there since 2023; Rixer became the managing broker for Citypoint in 2023. The Chojnacki Defendants dispute that Long herself worked for Citypoint any earlier than April 2025. Rixer and Chojnacki also co-owned the now dissolved Illinois Assets LLC.

Long is involved in this action through her alleged involvement in some of the financial entities that Plaintiff argues make up the Citypoint/Citipoint Enterprise: now dissolved Defendant First National Financial (FNF), now dissolved entity Defendant TCF National Holdings (TCF), and Prairie Raynor. Long was the sole shareholder, officer and director of FNF prior to its dissolution on December 20, 2024; she was also the sole signatory on FNF's bank account. Although Rixer and Chojnacki created TCF, Long was the sole shareholder and officer of TCF via FNF; Long was also the sole signatory on the bank account and sole person who had authority to act on behalf of the bank account for TCF, (which Defendants disputed in some cases but admitted

on the *Malik* docket (Dkt. 436 ¶ 16), so the Court considers it admitted). Through this organizational structure, Long was the face of TCF; a design that Plaintiff asserts was to conceal Rixer and Chojnacki from the public record, whereas the Chojnacki Defendants assert was a decision made for branding purposes.

Former Defendant Rachel Irwin was an employee of Chojnacki's now dissolved Chojnacki Real Estate, Inc. corporation, and then an employee of former Defendant Midwest Title and Closing Services, which she co-owned with Chojnacki. Irwin was also General Counsel for Rixer and Chojnacki's EJ Investments and a shareholder of XYZABC, Inc., a Delaware corporation that she co-owned with Chojnacki. XYZABC, Inc. was the manager of Midwest Title and Closing Services. Via these entities, Irwin communicated with Chojnacki, Rixer, and Long's lenders, organized entities, prepared operating agreements and bylaws, amendments to bylaws and operating agreements, and other legal documents for Chojnacki, Rixer, Long and their entities; Irwin also acted as "Seller's" attorney for Chojnacki, Rixer, Long and their entities.

This case also features the Brandonisio Defendants, who are related to but filed separately from the CK Defendants. Brothers Christopher, David and Kevin Brandonisio, childhood friends of Chojnacki, together operate three relevant businesses: 1) BMO Property Management, Inc., ("BMO") of which David was the sole shareholder prior to its dissolution; 2) National Asset Management, Inc. ("National Asset"), of which Chris was President and sole shareholder and of which Kevin was Secretary; and 3) CK Construction, of which Chris was President and of which Kevin was Senior Project Manager/Superintendent. (Dkt. 162 ¶¶ 14, 23; Dkt. 163 ¶ 2). Chojnacki was a periodic customer of CK. (Dkt. 162 ¶ 17). BMO is one of Chris's clients in his personal capacity: he performed bidding services for BMO. (Dkt. 162 ¶ 32). Neither Chris nor Kevin has

ever had an ownership interest in BMO and neither of them has been an officer of BMO. (Dkt. 244 ¶ 36).

It is also undisputed that Kevin—a 50 percent owner of CK—is "not familiar with Flip Chicago" or Chase Real Estate, as well as that Kevin does not know why the names "David," "Kevin," and "Chris" appear on Flip Chicago's website or that they even appeared on that website; nor does Plaintiff dispute that Chris also does not know why the names "David," "Kevin," and "Chris" appear on Flip Chicago's website. (Dkt. 162 ¶¶ 14–20). Plaintiff also does not dispute that Kevin "does not know what [BMO] does or whether [it] holds title for a fee." (Dkt. 162 ¶ 21).

That leaves the Murphy Defendants. Murphy was the sole shareholder, President, and Director of 1st Midwest Financial, Inc. ("1st Midwest") (prior to its dissolution) and went to school with Chojnacki. (Dkt. 161 ¶ 2; Dkt. 174 ¶ 36). Murphy testified that 1st Midwest's business was to hold title to properties for agents, and one example of that was holding real estate for Long. (Dkt. 161 ¶ 3; Dkt. 174 ¶ 37). Murphy's 1st Midwest bank account reflects that he received substantial funds via wires from the sale of real estate and then wired substantial funds to Long; although Murphy's "unofficial arrangement" was with Long, Murphy does not dispute that Chojnacki also directed Murphy's 1st Midwest company's wiring of the funds. (Dkt. 174 ¶ 37). Murphy does not dispute that he held title and received and transferred substantial funds to Long related to Weiner's real estate through First Midwest Financial. (Dkt. 174 ¶ 38).

The corporate address initially listed on the Secretary of State's website for 1st Midwest was 1046 Midwest Road, in Northbrook, before being properly corrected to 1046 Midway Road in Northbrook, which the Murphy Defendants contend was a clerical error while Plaintiff argues this was part of a broader scheme on the confusing grounds that "the street name "Midwest" would reinforce the incorrect conclusion that 1st Midwest was a bank." (Dkt. 161 ¶¶ 4–5).

## II. The Weiner Connection

With that, the Court turns to the facts that connect Weiner, a Mexico resident, to this complicated web of actors.[4] In early 2020, around the start of the COVID-19 pandemic, Weiner decided to pivot his earlier experience in property management into real estate investment. (Dkt. 158 ¶¶ 9–11). He would go on to purchase eight total properties through Chase Real Estate (four of which are no longer at issue due to Plaintiff's waiver) for $1,421,000; collectively, Weiner sold those same eight properties for $2,915,715, for a total gross profit of $1,494,715.00. (Dkt. 158 ¶ 77).

He purchased his first two properties—the Winchester Avenue and Flossmoor Road Properties—in his own name, though McNair was involved from the start, supervising the rehab work and splitting profits fifty-fifty. (Dkt. 158 ¶¶ 12–14). (These flips predate Rapport and thus are not implicated in the aforementioned standing issue.) Later, Weiner decided to purchase two fix and flip properties through his own company, Ecliptic Holdings LLC, without McNair involved at all: the Thornwood Court and Rose Street Properties. (Dkt. 158 ¶ 23). Weiner wanted bigger profit margins than he was making through his split with McNair, and Mikosz made a "compelling" suggestion that he try using one of Chase's "in-house" contractors instead of partnering with McNair "and see if it goes different." (Dkt. 158 ¶ 24). Weiner claims that Mikosz promised that her "in-house" contractor would "come in below budget" and would "get it done." (Dkt. 158 ¶ 25).

CK Construction ("CK") worked on Thornwood Court, the only project that CK worked on with Weiner. (Dkt. 162 ¶¶ 1–2). Communication with CK on this project was "clean, light" and the work it performed on this project had "no friction." (Dkt. 162 ¶ 3). CK did not make any

---

[4] As noted above, the facts related to the properties at Forest Avenue, McCarron Road, West End Avenue, and Highland Avenue are not included in this record.

representations to Weiner regarding the condition of any property he purchased. (Dkt. 162 ¶ 8). Weiner could not recall if he ever saw CK on Flip Chicago's website. (Dkt. 162 ¶ 9). Weiner thought Lori Mikosz had influence over CK, but not that she was a puppet master of it. (Dkt. 162 ¶ 10). Weiner admits he did not have any issues with CK on this project and it went smoothly. (Dkt. 162 ¶ 4). Weiner testified that CK performed the work on the records he was shown during his testimony, and that CK did not need to re-perform the work respecting the records he was shown during his testimony. (Dkt. 162 ¶¶ 5–6). Weiner's experience with a later contractor was "tremendously lower" than his experience with CK. (Dkt. 162 ¶ 7).

After completing the rehab work for the Thornwood Court property, Weiner received an invoice for $10,002.18 from FNBO Property Management ("FNBO") for "tier 2 management." (Dkt. 158 ¶ 26). Weiner testified that he initially did not pay the invoice because "it popped out of nowhere" and he was "mortified" when he first saw it; however, Weiner admitted that he "probably did end up paying that 10,000" as Mikosz's share of the profits from the Thornwood Court fix and flip. (Dkt. 158 ¶¶ 27–29).

Prior to closing on the Rose Street property, Weiner received a rehab estimate from CK for $75,000. (Dkt. 158 ¶ 33). After closing on the Rose Street property, Mikosz told Weiner that CK was not available and forwarded him a rehab estimate prepared by Five Star Construction Services LLC ("Five Star"); though the estimate was $5,000 more, Weiner testified that since he had already purchased, he was not in a position to go his own route. Dkt. 158 ¶¶ 34–35). During the rehab of the Rose Street property, Weiner's property insurer conducted a survey and discovered a water leak in the basement. (Dkt. 158 ¶ 36). Weiner's insurer required him to submit proof the leak was fixed so that he could "sustain the insurance on Rose." (Dkt. 158 ¶ 36). Five Star fixed the water

leak, which added $10,000 to the rehab budget. (Dkt. 158 ¶ 37). Weiner paid Five Star another $6,850 for some roof and gutter related repairs, which brought the total rehab cost for the Rose Street property to $96,850. (Dkt. 158 ¶ 38).

Later, when Five Star was pulling permits for the rehab project, they came across an "occupancy report," and advised Weiner that the Village would not issue them the necessary permits until Five Star re-wrote the scope of work to include "all the items on the failed occupancy report." (Dkt. 158 ¶ 39). The water leak in the basement that Weiner's insurer spotted post-closing is not listed on the Village's inspection report. (Dkt. 158 ¶ 40). Weiner testified that he had no idea that the Village's report even existed. (Dkt. 158 ¶ 41).

During his testimony, though, he was shown an email that Mikosz forwarded him on March 13, 2022 (five days before the closing) that included a copy of the Village's report: Weiner said he had not looked at the attachment until October. (Dkt. 158 ¶¶ 41–42). Weiner stated that around the same time Five Star alerted him to the Village's occupancy report in May 2022, he confronted Mikosz about it, but he could not recall what she told him. (Dkt. 158 ¶ 43). It was also around this same time in May 2022 that he decided the Rose Street property would be his last flip, because he "wasn't making any money. I lost money on a couple [fix and flips]" and he did not think he could "afford, you know, to lose time and money anymore." (Dkt. 158 ¶ 43).

Aside from an issue with a drainpipe or downspout, the Rose Street property was ready to list towards the end of August 2022. (Dkt. 158 ¶ 45). Weiner testified that the drainpipe or downspout was in the wrong spot and looked unsightly; however, he could not remember who he hired to fix it; what fixing it involved; how much it cost to fix; and he could only speculate that it maybe took a couple of days to fix. (Dkt. 158 ¶ 45). Weiner sold the Rose Street property for $297,000. (Dkt. 158 ¶ 46). Weiner contends that, regarding the Rose Street project, Five Star was

a "pop-up company" created by Mikosz, and that while her husband may have owned the company, she was the "puppet master" controlling things. (Dkt. 158 ¶ 47).

The only "back end" or post-closing damages Weiner is claiming is $100,000 for the Rose Street property. (Dkt. 158 ¶ 48). That figure includes the $5,000 difference between CK's pre-closing estimate and Five Star's post-closing proposal. Although Weiner admitted he did not know what was driving the price increase, he speculated that defendants tacked on an additional $5,000 "because we got Weiner by the shorthairs." (Dkt. 158 ¶ 49).

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g.*, *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). "A dispute of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021). The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (citation omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "[S]peculation and conjecture" also cannot defeat a motion for summary judgment. *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013). In addition, not all factual disputes will preclude the entry of summary judgment, only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted).

## DISCUSSION

After removing the former Defendants, the remaining landscape of Count I is as follows: Malik alleges that Chojnacki and some of his defendant entities, the Murphy Defendants, and the Brandonisio Defendants violated § 1962(c), (d),[5] while Rixer and some of the Chojnacki Defendants violated only § 1962(d). Given the fact that the Chojnacki Defendants filed substantively comparable motions for summary judgment in all of the related cases, the Court assumes familiarity with the analysis laid out in *Malik et al v. Prairie Raynor LLC et al*, 23-cv-1182, and related dockets. Indeed, in this case, the Parties regurgitate their arguments with regard to the RICO claims almost verbatim, so the Court need not re-explicate its analysis on the same: as in *Stafford*, a jury could find that Weiner could have obtained at least some of the properties "at the same time in the same place" as Defendants; however, again as in *Stafford*, there can be no "lost investment bargain" theory of RICO injury where the value of property sold is not as high as represented, but is at least what the Plaintiff paid for it. On this record, nothing indicates that Weiner did not get the benefit of his bargain, most certainly not his conclusory opinions that he anticipated making more money on the flips. On the state law claims, Plaintiff and the Chojnacki Defendants can go to trial on the scope of damages, but where Congress inputs a statutory requirement on the claim's ability to go forward in the first place, this Court must heed that call.

It is altogether different, however, to allege a RICO violation where the RICO scheme diminishes the actual value of property—in this case, Weiner's claims about back-end damages. The only "back end" or post-closing damages Weiner is claiming is $100,000 for the Rose Street property. (Dkt. 158 ¶ 48). Defendants contend that the Weiner's claims about additional costs, repairs, and delinquent tenants are insufficient and vague, but those arguments speak not to the

[55] The Complaint says "18 U.S.C. 1962(c), (d)," for these Defendants, but does not discuss the specific conspiracy aspect; nevertheless, the Complaint clearly indicates where the CK Defendants are only facing allegations under § 1962(d).

validity of a claimed injury for RICO standing purposes and instead go to the scope of damages (if any), a query that is best fit for a jury's resolution.

This Court's resolution of the RICO "enterprise" requirement as to the Chojnacki Defendants is likewise governed by its previous rulings. Weiner, like Malik and Stafford, has developed a record that could conceivably allow a reasonable jury to find that Chojnacki participated in the operation or management of an enterprise to lure in investors through misrepresentations of building ownership and condition even if he was not Plaintiff's point of contact for the operation. Further, a § 1962(c) claim does not require proof that Chojnacki was the exclusive "boss" of the operation so long as a jury could find him reasonably involved in managing it. *See Muskegan Hotels, LLC v. Patel*, 986 F.3d 692, 698 (7th Cir. 2021) ("Lower-rung participants and even third-party outsiders can be liable, provided they play a part in operating or managing the enterprise"). For Rixer and the remaining Chojnacki Defendant entities, facing the § 1962(d) claim, the question is slightly different. Plaintiff need not prove that they operated or managed the enterprise, instead, he would have to show that they "with knowledge of a conspiracy to violate the RICO statute, agreed to conduct or participate in the affairs of an enterprise through a pattern of racketeering and agreed to the commission of two predicate acts of racketeering." *Id.* at 699. "[M]ere association with conspirators is not enough to establish an agreement." *See Domanus v. Locke Lord LLP*, 847 F.3d 469, 482 (7th Cir. 2017). Nonetheless, "when the acts performed by the alleged members of the conspiracy are unlikely to have been done alone, the court may infer agreement." *Domanus v. Locke Lord LLP*, 847 F.3d 469, 482 (7th Cir. 2017).

As for the other Defendants: Plaintiff made no effort to counter the specific arguments of the Murphy Defendants and the Brandonisio Defendants on the RICO claims with a single citation to case law; the best Plaintiff can do is lob allegations about the alleged criminality of these

entities' tax filings—but Plaintiff is not the IRS nor the U.S. Attorney's Office, and these comments are unrelated to the facts at hand (namely, Plaintiff's specific transactions). At this stage in the litigation, Plaintiff must do more than rest on generalized arguments, especially for Defendants who do not appear in most of the related cases. Nowhere does Plaintiff specifically defend how these Defendants are liable for his *specific* claims. The Court will not entertain such an underdeveloped argument. *See U.S. v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived"). Thus, the Murphy and Brandonisio Defendants' motions for summary judgment on the RICO claims are granted.

## I. State-Law Claims (Counts II–VI)

Next, Chojnacki moves for summary judgment on Said's state law claims for common-law fraud (Count II), violation of the ICFA (Count III); violation of the IRELA (Count IV); and negligent misrepresentation (Count V). (Dkt. 209). The Brandonisio and Murphy Defendants joined the Chojnacki Defendants in moving for summary judgment on the claim for unjust enrichment (Count VI). While this is not the first case in the related litigation in which Plaintiff fails to defend their claims, it is certainly one of the more egregious. Rather than engage with this contention on the substance, Plaintiff recites the general theory of the case with conclusory assessments, which are not sufficient to defeat a proper motion for summary judgment. *First Commodity Traders, Inc. v. Heinhold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir.1985).

Plaintiff's defense of five counts amounts to five conclusory paragraphs summarizing the Plaintiff's broad theory of the alleged wrong completely unmoored from any of the elements underlying their state-law claims. (Dkt. 164 at 23–24). Weiner cites one single case across all five state law claims in defense of Weiner's reliance, which is in itself only one element of an Illinois

fraud claim. *See Houben v. Telular Corp.*, 231 F.3d 1066, 1074 (7th Cir. 2000) ("In order to establish fraud under Illinois law, a plaintiff must prove that (1) defendant made a false statement; (2) of material fact; (3) which defendant knew or believed to be false; (4) with the intent to induce plaintiff to act; (5) the plaintiff justifiably relied on the statement; and (6) the plaintiff suffered damage from such reliance."). Otherwise, Weiner cites only to his statement of facts. Even briefly overlooking the fact that Plaintiff's attorneys do not make any effort to tie these 56.1 references to any individual Count, in no way would they have even come close to creating a disputed issue of material fact. *See United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010) (at the summary judgment stage, it is "not the district court's job to sift through the record and make (a party's) case for him"). As courts have often admonished, "summary judgment is the 'put up or shut up' moment in the life of a case." *See, e.g.*, *In re Airadigm Communications, Inc.*, 616 F.3d 642, 657 (7th Cir.2010). Thus, the Court will not "address those arguments which it finds incomprehensible." *Pope v. United States*, 2012 WL 5389807, at *2 (N.D. Ill. Nov. 1, 2012) (citing *Smith v. Town of Eaton, Ind.*, 910 F.2d 1469, 1470-71 (7th Cir. 1990)).

After the defendant has made its showing, the non-moving party must come forth with evidence showing what facts are in actual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). If the non-moving party fails to do so, summary judgment is proper. *United States v. Selenske*, 882 F.2d 220 (7th Cir.1989). Thus, the motion for summary judgment is also granted as to these state law claims. Chen's wholly unsupported and cursory positions fail as a matter of fact and law.

## CONCLUSION

For the above reasons, the Chojnacki Defendants' Motion for Summary Judgment [Dkt. 142] is granted in part and denied in part. As to the RICO claims: the Motions are granted with

regard to Plaintiff's attempt to proceed under 18 U.S.C. § 1964 on a theory of speculative profit loss; they are otherwise denied as to the RICO claims, which remain in the case in accordance with the analysis herein and will proceed to trial unless the parties can reach a settlement. The Court grants in full the other three sets of Defendants' Motions. [Dkts. 138, 149, 152]. The Court also grants summary judgment on all state-law claims as to all Defendants.

Virginia M. Kendall
United States District Judge

Date: September 9, 2026